IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

02 SEP 30 PM 4: 19

U.S. DISTRICT COURT
N.D. OF ALABAMA

$P8$

| | | |
|---|---|---|
| ROBIN CRANE and GAIL CASTLEBERRY, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV-00-JEO-2801-S |
| | ) | |
| SUSAN SCHEIN CHEVROLET, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**ENTERED**

OCT - 1 2002

## <u>MEMORANDUM OPINION</u>

Plaintiffs Robin Crane and Gail Castleberry have filed this joint action, asserting various claims against Susan Schein Chevrolet, Inc., for violation of Title VII of the Civil Rights Act of 1964. Specifically, Plaintiff Robin Crane (hereinafter "Crane" or "the plaintiff") asserts that she was subjected to a hostile environment premised on her gender and that she was constructively discharged from her employment at Susan Schein Chevrolet, Inc. (hereinafter "Schein Chevrolet" or "the defendant"). (Doc. 30 at 1). Plaintiff Gail Castleberry (hereinafter "Castleberry" or "the plaintiff") asserts a hostile environment claim and gender discrimination in demotion and constructive discharge claims. (Doc. 30 at 1). The case is presently before the court on the defendant's motions for summary judgment on the claims of both plaintiffs (doc. 21 & 24) and on the defendant's motions to strike portions of the plaintiffs' affidavits (doc. 32 & 33). The parties have fully briefed the legal issues and oral argument was conducted on September 1, 2002.

42

## I. FACTS[1]

### A. Robin Crane

Susan Schein is the owner of Schein Chevrolet, Inc. (Schein Depo. at 9).[2] She spends most of her time at the Chevrolet dealership. She also owns a Chrysler dealership located about a fourth of a mile from the Chevrolet dealership. (Schein Depo. at 50-51). The top management person below Schein is the General Manager. (*Id*. at 12). Below the General Manager are the mangers for each department, including new car sales, used car sales, rentals, service and parts, and the body shop. (*Id*. at 16). The salespeople report to either the New Car Sales Manager or the Used Car Sales Managers, who are equal in authority. (*Id*. at 26). Salespeople report to either manager, depending upon the nature of the sale. (*Id*.).

Crane has been employed by the defendant on two separate occasions. She first worked for the defendant in December 1996 as a salesperson. (Crane Aff. at 1).[3] The General Manager's position was initially filled at that time by Mike Alpine, but eventually Robin Wells assumed that post. (Doc. 22 at 3). Crane worked for Joe Glass ("Glass"), the used car manager, and Don Scott ("Scott"), the new car sales manager. (Doc. 30 at 2). Scott came to Schein Chevrolet in September of 1997 as the Finance and Insurance Manager. (Scott Depo. at 21-22).[4] Tony

---

[1] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiffs. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[2] Excerpts from Schein's deposition are found at document 23, exhibit 5; document 26, exhibit 5; and document 31, exhibit C.

[3] Crane's affidavit is located at document 31, exhibit A.

[4] Excerpts from Scott's deposition are located at document 23, exhibit 8; document 26, exhibit 10; and document 31, exhibit E.

DeSanto also served as Finance and Insurance Manager during Crane's first employment with Schein Chevrolet. Crane worked as a salesperson until she resigned on July 10, 1998. (Crane Aff. at ¶ 2). She stated in her deposition that she "thought [she] had a better sales opportunity to leave, and [she] did."[5] (Crane Depo. at 58).[6] Crane told Susan Schein that she "couldn't handle what was going on at the dealership anymore, and that [she] had a better sales opportunity and [she] was going to go to work there." (*Id*. at 60).

Crane states that, during her initial tenure with the defendant, Scott and DeSanto subjected her to foul language, screaming, being fired and rehired, sexual comments, name calling ("bitch"), and not being allowed days off even though male employees were frequently allowed to take days off. (Crane Aff. at ¶ 4). By way of example, she states that while Scott was teaching her to handle the financial side of sales, he told Crane, "I've taught a lot of women how to do this for a blow job." (*Id*.). She complained directly to Schein but the treatment continued until she resigned. (*Id*. at ¶ 5).

In September 1998, Glass contacted Crane and requested that she return to work for the defendant. (Crane Aff. at ¶ 7). Glass stated that Schein wanted to speak with her and that Schein had Scott on a "short leash." (*Id*.). Crane then spoke with Schein by telephone and Schein told Crane that she was aware of what had been going on and that it was going to stop. (*Id*. at ¶ 8). Based on these assurances, Crane returned to Schein in late September. (Crane Depo. at 77).

Crane states that Scott's initial treatment of her was much improved. (Crane Aff. at ¶ 9).

---

[5] Crane further testified that she had interviewed at another dealer after she found out about the job earlier from a friend. (Crane Depo. at 59).

[6] Excerpts from Crane's deposition are found at document 23, exhibit 1; document 36, exhibit 1; and document 37, exhibit 4.

However, Scott soon began to engage in the same offensive conduct as before. (*Id*. at ¶ 10). According to Crane, Scott cussed at her on a regular basis regarding closing deals and selling cars. (*Id*. at ¶ 10(a); Crane Depo. at 91). On two occasions, Scott told Crane that she was "having a good butt day" while grabbing Crane's buttocks. (*Id*. at ¶ 10(b); Crane Depo. at 91-92). Crane told Scott not to touch her. (*Id*. at 92-93). He then laughed at her. (*Id*.). Helen Holcombe, the defendant's receptionist, overheard Scott tell Crane that the reason her ass was so firm was because she rode horses all the time. (Holcombe Depo. at 34-35).[7] Holcombe took notice of this instance because she heard a slap and turned around. (*Id*. at 35). Holcombe does not know what created the slapping sound but recalls Crane having her hand on her hip after hearing the slap. (*Id*.). Crane stated to Holcombe, "this is what I have to put up with."[8] (*Id*. at 36).

Scott also revealed "explicit details of his alleged sex life," which included encounters with customers and other employees. (Crane Depo. at 94-95, 151; Crane Aff. at ¶ 10(d)). Scott downloaded pornographic pictures and engaged in cybersex while at work. (Crane Aff. at ¶ 10(e)). Crane observed Scott's Internet activity when she had to go into Scott's office to close various deals. (*Id*.). Casey Pilgrim, who was responsible for defendant's computers, altered the pornographic pictures on a computer so that other people's heads were on them and placed the picture at least once on Crane's desk. (*Id*. at ¶ 10(g); Crane Depo. at 115). Crane complained to Wells at least twice; he stated that that was just Scott and he took no action in response to her complaint. (Crane Aff. at ¶¶ 10(f) & (g); Crane Depo. at 113-14).

---

[7] Holcombe's deposition is found at document 31, exhibit B.

[8] It is unclear whether this is a part of the two instances Crane mentioned or whether it was a third instance. Regardless, that does not change the outcome on any claim.

Scott also referred to Castleberry as a "dyke," "lesbian," and "butch" in Crane's presence and called Crane a "whore" and "bitch" in a manager's meeting that she did not attend. (Crane Aff. at ¶ 10(l)). Crane states that she never spoke to her male co-workers about sexual encounters and never used curse words on the showroom floor or in front of customers. (Crane Aff. at ¶ 12). Crane admits having used foul language at work. (*Id.*).

Crane alleges that male salespersons were unfair to female salespersons. Crane states that male salespersons refused to split commissions with her even when she was a part of a deal. (Crane Aff. at ¶ 10(h)). In one specific instance, David Hollingsworth refused to split a commission with Crane even though Crane had closed the deal. (*Id.*). Crane complained to Wells, who refused to do anything about it. (*Id.*). This happened concerning another transaction involving a friend of Crane. She made the sale, but Scott gave half of the deal to Hollingsworth even though he did not participate in the deal. (*Id.* at ¶ 10(i)). She lost almost $1,000 as a consequence.

Crane also states that Scott discriminated against her with regard to granting days off. In May of 1999, Crane requested a Saturday off so she could attend a softball tournament, in which her daughter was playing. (Crane Aff. at ¶¶ 14-15). Her request was initially granted and Crane made arrangements for another employee (Don Eddings) to close an expected sale. (*Id.*). However, when Scott found out about the arrangements she had made to handle the deal, he stated, "Fuck you, Robin, if you can't come to goddamn work." (*Id.*). Scott then proceeded to give the entire sale to Bobby Chance, another male salesman. (*Id.*). Crane was so upset that she "packed [her] stuff up" and she "calmly went home." (Crane Depo. at 120).

Crane complained to Wells on the next day about the day off and Scott's handling of the

5

commission. (Crane Depo. at 120). Wells told her to "[g]et over it; that's just Don Scott. He can do whatever he wants." (Crane Aff. at ¶ 16). Crane also spoke with the finance and insurance manager, Rick Weinberg. (*Id.*). Weinberg told Crane that he had no control over Scott. (*Id.*). Crane then called Schein at home, despite a warning from Wells not to do so. (*Id.* at ¶¶ 16 & 19; Crane Depo. at 123). Crane told Schein that she was upset about something. (Schein Depo. at 62-63). Schein stated that she was too busy to discuss the matter. (Crane Aff. at ¶ 16; Schein Depo. at 62-63). Schein believed that she could take care of any problem on the following Monday. (*Id.* at 63).

Crane found another job on Monday at Ivan Leonard Chevrolet. (Crane Aff. at ¶ 17). Ivan Leonard Chevrolet called Schein Chevrolet to let them know that Crane got the job there. (Crane Depo. at 123). Crane returned to Schein Chevrolet to gather her belongings. (Crane Aff. at ¶ 17). A new male employee had replaced her and was sitting at her desk. (*Id.*). Her belongings had been removed and some were broken. (*Id.*). Seeing Crane, Scott demanded that someone call the police and grabbed Crane's arm to restrain her. (*Id.*). Crane called Scott a son of a bitch and told him to leave her alone. (*Id.*). Crane then left the premises. (*Id.*).

Crane filed a discrimination charge with the EEOC on June 29, 1999. (Crane Depo. at Ex. 2).[9] Schein conducted an investigation. She prepared a questionnaire that was completed during the interviews she conducted.[10] (Schein Depo. at Ex. 7). Schein concluded that Scott, Crane, and other employees had behaved inappropriately. (Schein Depo. at 229). She did not find any evidence of sexual harassment. (*Id.* at 228-29). Her investigation revealed that Crane

---

[9] The EEOC charge is found at document 23, exhibit 2.

[10] The questionnaire and the answers are found at document 23, exhibit 7.

6

cussed, touched male employees in sexually provocative ways, and discussed sexual topics with other employees. (Schein Depo. at Ex. 7). Schein discussed the need to curtail inappropriate conduct at various managers meetings that were held subsequent to the investigation and subsequently has not received any complaints of sexual harassment. (Schein Depo. at 45, 179-80).

### B. Gail Castleberry

Gail Castleberry began working for the defendant on January 28, 1999. (Castleberry Aff. at ¶ 3).[11] She began as a salesperson selling new and used cars. (*Id.*). During the first weeks of Castleberry's employment, she recalls a "number of rumors about Glass," the used car manager. (*Id.* at ¶ 4). The rumors were that Glass had been involved with Mandy Nelson, a married former female employee in defendant's office, and that Nelson had been killed by her husband. (*Id.*). Castleberry asserts that, due to a lack of attention that resulted from this alleged incident, Glass's employment with the defendant was terminated by Wells, the general manager.[12] (*Id.* at ¶ 5). Wells then asked Castleberry if she would fill the used car manager position. (*Id.*). Castleberry accepted the offer. (*Id.* at ¶ 6).[13]

According to Castleberry, she was praised for her handling of the used car department. (Castleberry Aff. at ¶ 7). In particular, Castleberry managed to remove older inventory before it could depreciate further. (*Id.* at ¶ 8). However, in order to do so, Castleberry sold some cars at a break-even price. (*Id.*). She followed this course of action during February, March, and April of

---

[11] Castleberry's affidavit is found at document 31, exhibit D.

[12] Schein similarly testified that Glass was terminated because his performance became inconsistent. (Schein Depo. at 88).

[13] Scott stated that he understood from Wells that this position was a "temporary" one. (Scott Depo. at 86)

7

1999.  (*Id.*).

Castleberry alleges that she was subjected to "offensive" conduct by Scott, Wells and

others.  (Castleberry Aff. at ¶ 9).  While working for the defendant, Castleberry "learned that

several employees and Don Scott had referred to [her] as a 'lesbian' or a 'dyke.'"  (*Id.*).

Castleberry believes she was chastised inappropriately for reprimanding David

Hollingsworth, a male salesperson.  (Castleberry Aff. at ¶ 9(b)).  Castleberry marked

Hollingsworth as "gone" when he did not show up for work on two consecutive days.  (*Id.* at 4).

Castleberry asked Robin Crane to answer Hollingsworth's calls.  (*Id.*).  When Hollingsworth

came in for work half way through the second day, he informed Wells that Castleberry had

marked him as "gone."  (*Id.*).  Wells became upset, called Castleberry and Crane into his office,

and stated, "Let me tell you one goddamn thing.  I'm going to fire your goddamn ass if you say a

fucking word."  (*Id.*).  Castleberry offered to go back to sales but Wells assured her that she was

doing a good job.  (*Id.*).

Castleberry was present when Scott discussed sexual topics in chat rooms and

downloaded pornographic pictures from the Internet.  (Castleberry Aff. at ¶ 9(c)).  One of the

pictures was apparently the same one described by Crane.  (Crane Aff. at ¶ 9(d)).  Castleberry,

like Crane, states that Casey Pilgrim inserted other peoples' heads on the picture and displayed

the result.  (Castleberry Aff. at ¶ 9(e)).

On the day after Scott and Pilgrim displayed the pornographic pictures, Scott and other

male employees discussed the pictures and a female customer who had recently purchased a car

at Susan Schein Chevrolet.  (Castleberry Aff. at ¶ 9(f)).  Scott explained how he had met the

customer at a Holiday Inn Express, strapped her to the bed, how she had screamed as they had

8

sex, and how he could not even walk afterward.  (*Id.*).

Scott revealed information to employees, including Castleberry, which Castleberry found offensive.  Scott explained to employees that he would wear Pampers or Depends to ball games so that he did not have to go to the restroom.  (Castleberry Aff. at ¶ 9(g)).  Scott also said that he showered with his wife and defecated in the shower.  (*Id.* at ¶ 9(h)).  Several employees and Wells told Scott that he was "sick."  (*Id.*).  Scott also made derogatory references to her breasts.  (*Id.* at ¶ 9(j)).  She told him to refer to them as "puppies" since that was what she did.  (*Id.*).

Castleberry complained to management about Scott's behavior, but Wells simply stated that Don was just like that, that Don was perverted, that Don should be overlooked, and that Scott was a good new car manager.  (Castleberry Aff. at ¶ 12).  Scott says that Castleberry spoke sexually to employees as well.  (Scott Depo. at 142).  According to Scott, Castleberry made numerous remarks about the attractiveness of her breasts, while grabbing them, and also about finding a man in the penitentiary.  (*Id.*).

Castleberry acknowledges having kidded with Wells and employees about "finding a man" at the local penitentiary.  (Castleberry Aff. at ¶ 10).  She states that the statement was a joke concerning her past taste in men and her ex-husband in particular.  (*Id.*).  She denies ever having discussed her sex life with coworkers but admits to using foul language while at work.  (*Id.*).

In April of 1999, Wells informed Castleberry that Fred Tetro, the finance and information manager, was going to take her place as used car manager.  (Castleberry Aff. at ¶ 12).[14]  When Castleberry asked for an explanation, Wells replied, "Well he just is.  I'm putting a guy in your

---

[14] There are two paragraphs numbered "13."  This reference is to the first paragraph.

9

place." (*Id.*).  Wells told Castleberry that they would probably give her a job at the Chrysler

store.  (*Id.* at 13).  Thereafter, she went to the Chrysler dealership.  She was crying and upset.

(*Id.*).  When no one would see her, she left.  (*Id.*).  She was not offered a job at the Chrysler

dealership and no one told her that she "would definitely be accepted there."  (*Id.*).

### C. The Schein Chevrolet Sexual Harassment Policy

The defendant distributes an Employment Packet to employees, which outlines

defendant's policy on harassment.  (Schein Depo. at Ex. 1).[15]  The policy states in section II:

> Our organization does not tolerate harassment of employees.  Any form of
> harassment related to an employee's race, color, sex, religion, national origin, age
> or disability is a violation of Corporate policy and subject to disciplinary action.
> For clarification, harassment includes, but is not limited to slurs, jokes, vulgarity,
> verbal, graphic or physical conduct relating to an individual's . . . sex . . . or
> sexual preference.  It also includes any unwanted or unwelcome sexual advances,
> requests for sexual favors, and other verbal, graphic or physical conduct of a
> sexual nature.

> If, at any time, you feel you are the recipient of the above described
> harassment, you are encouraged to immediately notify either your immediate
> supervisor, or arrange for a meeting with Susan Schein to discuss the problem.

> * * *

> SEXUAL HARASSMENT

> Sexual harassment is a form of sex discrimination that violates Title VII of
> the Civil Rights Act of 1964.  Sexual harassment is a serious offense and will not
> be tolerated from anyone – supervisors, managers, coworkers, clients, vendors or
> customers.

> More specifically, sexual harassment includes repeated and unwelcome
> verbal or physical sexual advances, sexually explicit or derogatory remarks, or
> statements made by someone in the work place that are offensive or objectionable
> when:

---

[15] The policy is found at document 23, exhibit 6.

10

> 1. submission to the conduct is either an explicit or implicit term or
> condition of employment; or
>
> 2. submission to or objection to the conduct is used as a basis for
> employment decisions affecting an individual; or
>
> 3. the conduct has the purpose or effect of substantially interfering with
> work performance, or of creating an intimidating, hostile, abusive or
> offensive work environment.

(*Id.*).  The policy encourages employees to direct complaints to Susan Schein, Mike Alpine,

Melba Kane, or Lonnie Schein and assures the employee that he or she should not feel confined

to reporting to a supervisor who may be committing harassment.  (*Id.* at 12).  According to

Schein, her comptroller goes over the employee packet with employees.  (Schein Depo. at 42).

Scott was given a copy of the harassment policy manual.  (Scott Depo. at 35).  The policy

was not discussed with Scott, nor was he trained on sexual harassment in the workplace.  (*Id.*).

The following exchange illustrates Scott's understanding of the policy.

> Q:    What was your understanding of what that policy was?
>
> A:    Well, basically not to harass somebody.  I mean, touch them, make jokes about
>       them, use foul language that's degrading to men or women, and if someone did
>       say something to men or women, and if someone did say something and it
>       offended them, never to do it again.  That's the end of it.  It doesn't happen again.

(*Id.* at 36).  Scott believes that, in the event of a sexual harassment complaint, his job is to

counsel the person making the complaint, speak with the person who allegedly committed the

offense, and hand the matter off to Susan Schein.  (*Id.*).  Scott states that he never received a

sexual harassment complaint.  (*Id.*).

## II. MOTIONS TO STRIKE

The defendant has moved to strike portions of the affidavits that were submitted by the

plaintiffs.  (Doc. 32 & 33).  The defendant asserts that "portions of [the plaintiffs' affidavits]

filed in opposition to defendant's motion for summary judgment . . . are not made on personal knowledge, would not be admissible in evidence or contradict [the plaintiffs'] prior sworn deposition testimony." (*Id.*).  The defendant further contends that the affidavits do not satisfy the requirements of Rule 56(e) of the FEDERAL RULES OF CIVIL PROCEDURE for affidavits submitted in support of or opposition to a motion for summary judgment.  (*Id.*).

**A. Robin Crane**

Schein Chevrolet first contends that paragraph 4(b) of the Crane affidavit is contradictory to Crane's sworn testimony.  (Doc. 32 at 2).  In paragraph 4(b), Crane states, "On several occasions, DeSanto yelled, screamed, and cursed at me, generally treating me in a manner in which he did not treat the men." (Crane Aff. at ¶ 4(b)).  According to the defendant, Crane states in her deposition that DeSanto probably cussed men too and exerted pressure on the other employees as well.  (Doc. 32 at 2, *citing* Crane Depo. at 33-35).[16]

Contradictory statements in an affidavit may be stricken when in conflict to prior testimony in a deposition.  The Eleventh Circuit Court of Appeals in *Van T. Junkins v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984), stated that "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  *Id.*, 736 F.2d at 657.  More particularly, in *Van T. Junkins*, the plaintiff brought an action against the manufacturer of prefabricated buildings to recover for alleged fraud and reckless misrepresentations in denying the plaintiff a dealership after he purchased land and a building.  During his deposition, the president of the

_____

[16] Page 33 of the deposition was not included in the exhibits.

12

plaintiff company testified three times that there was no condition attached to his purchasing the

building. *Id.*, 736 F.2d at 657.  On the motion for summary judgment, the president stated in an

affidavit that he had a meeting with representatives of the defendant who told him that if he

would purchase one of their buildings then he would be awarded the dealership. (*Id.*).  Affirming

the trial court's grant of summary judgment for the defendant, the court stated:

> Under these facts as presented, we agree with the district court that the
> affidavit constituted a sham.  When a party has given clear answers to
> unambiguous questions which negate the existence of any genuine issue of
> material fact, that party cannot thereafter create such an issue with an affidavit that
> merely contradicts, without explanation, previously given clear testimony.

(*Id.*).  In *Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986), the court stated:

> A definite distinction must be made between discrepancies which create
> transparent shams and discrepancies which create an issue of credibility or go to
> the weight of the evidence.  "An opposing party's affidavit should be considered
> although it differs from or varies [from] his evidence as given by deposition or
> another affidavit and the two in conjunction may disclose an issue of credibility."
> 6 Moore's Federal Practice ¶ 56.15[4] (2d ed. 1985) (footnote omitted).

> The purpose of summary judgment is to separate real, genuine issues from
> those which are formal or pretended.  To allow every failure of memory or
> variation in a witness's testimony to be disregarded as a sham would require far
> too much from lay witnesses and would deprive the trier of fact of the traditional
> opportunity to determine which point in time and with which words the witness
> (in this case, the affiant) was stating the truth.  Variations in a witness's testimony
> and any failure of memory throughout the course of discovery create an issue of
> credibility as to which part of the testimony should be given the greatest weight if
> credited at all.  Issues concerning the credibility of witnesses and weight of the
> evidence are questions of fact which require resolution by the trier of fact.  An
> affidavit may only be disregarded as a sham "when a party has given clear
> answers to unambiguous questions which negate the existence of any genuine
> issue of material fact . . . [and that party attempts] thereafter [to] create such an
> issue with an affidavit that merely contradicts, without explanation, previously
> given clear testimony." *Van T. Junkins* at 657.

> [E]very discrepancy contained in an affidavit does not justify a district
> court's refusal to give credence to such evidence.  *See Choudhry v. Jenkins*, 559
> F.2d 1085, 1090 (7th Cir.) (summary judgment was improper even though party's

testimony was "not a paradigm of cogency or persuasiveness," since it was not a "transparent sham"), *cert. denied sub nom., Indiana v. Choudhry*, 434 U.S. 997, 98 S. Ct. 634, 54 L. Ed. 2d 491 (1977). In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition. *Kennett-Murray, Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980).

The foregoing authorities demonstrate that the court should be cautious in rejecting testimony. However, if the plaintiffs have made statements in their affidavits that contradict those in their depositions, they are due to be stricken.

Crane's deposition statements about DeSanto do not conflict with the affidavit. To the contrary, they are relatively consistent. Crane states in her deposition, "He also picked on me because I was a woman." (Crane Depo. at 32). "Really they expected a lot more out of me because I was a good salesperson, and they just treated me different than they did the men. They would yell and scream and cuss at me, and they didn't do that to the men." (*Id.*) These statements are not so contradictory to those in the paragraph 4(b) of the affidavit that they must be stricken.

The defendant next asserts that paragraph 4(d) of Crane's affidavit, alleging that Scott fired her twice, is contradictory to her sworn deposition testimony. (Doc. 32 at 3, *citing* Crane Depo. at 85-87). The deposition testimony provides:

Q:    What would he say, Your [sic] fired?

A:    Yes. Get the hell out. Get your box and leave. That's how they treat you in the car business. Get your box and leave.

(Crane Depo. at 85). Mike Alpine told Crane on both occasions that Scott did not have the authority to fire her. (*Id.*) Crane thought she was fired and left when told to do so. (*Id.*). The statements are not so inconsistent that they should be excluded.

14

The defendant next moves to strike the last sentence of paragraph 4(d) of the Crane affidavit, which alleges that Crane spoke with Susan Schein before returning to work after being fired.  (Doc. 32 at 3, *citing* Crane Aff. at ¶ 4(d)).  In her affidavit, Crane states, that she "spoke to Ms. Schein concerning the situation prior to coming back to work."  (*Id.*).  In her deposition, she states, "One time I *think* I spoke with Susan before I came back."  (Crane Depo. at 86) (emphasis added).  The affidavit statement is not so inconsistent that it should be struck.

The defendant moves to strike plaintiff's affidavit statement that Scott told "dirty jokes" and made sexual comments at the smoking pole.  (Doc. 32 at 3, *citing* Crane Aff. at ¶ 4(e)).  In her deposition, Crane states that Scott spoke about "taking a dump in the shower" and "wearing Pampers to basketball games."  (Crane Depo. at 40-41).  The defendant believes these statements are contradictory.  The court does not find that the differences in these statements warrant exclusion of the complained-about portions of the affidavit.  In fact, the deposition testimony is consistent with what is stated in the affidavit.  Crane was asked about whether the "gross statements" and "jokes" were directed at her and she responded that they were not.  (*Id.* at 41).

Crane, in her affidavit, states that male salespersons frequently refused to split deals with her.  (Crane Aff. at ¶ 4(i)).  Again, the defendant believes this is contradictory to prior deposition testimony.  (Doc. 32 at 3).  In her deposition testimony, Crane recalls only one particular instance where this occurred.  (Crane Depo. at 53).  The defendant's motion to strike suggests that this is the only instance Crane is capable of recalling and, insofar as the affidavit suggests that this occurred on other occasions, it should be stricken.  (Doc. 32 at 3).  The affidavit is not contradictory because Crane indicates the disparate treatment occurred with several salespersons.  In her deposition, Crane states, "there were times where you would start a deal, like in the Used

15

Car Department, and you not be there, and they would just take the whole thing." (Crane Depo. at 55). Use of the word "they" suggests a reasonable likelihood that this occurred between Crane and different people at different times. The affidavit is not consistent with this statement and, therefore, is not due to be struck.

Crane, in her affidavit, states that she told Schein that she could not handle things at the dealership anymore and that she "was going elsewhere." (Crane Aff. at ¶ 6). In her deposition, Crane states that she could not handle the dealership anymore and that she "had a better sales opportunity." (Crane Depo. at 60). The defendant believes these statements are contradictory and that the affidavit statement should be stricken. (Doc. 32 at 4). The natural and reasonable extension of these statements is consistent: Crane "was going elsewhere" because she "had a better sales opportunity." The statements are not contradictory.

Crane, in her affidavit, alleges that she told Schein about Scott's statement that he had "taught a lot of women how to [handle finances] for a blow job." (Crane Aff. at ¶ 6). Crane, in her deposition, states that management prohibited her from speaking to Schein (Crane Depo. at 198-99), that she spoke to Schein about several incidents other than the one described above (*id.* at 81-84, 86), and that she told Schein about the comment during her first period of employment (*id.* at 146-47). The defendant asserts that these statements are contradictory. (Doc. 32 at 4). Crane's acknowledgment that she was prohibited from speaking to Schein does not mean that she in fact did not speak to Schein. Likewise, Crane's acknowledgment that she spoke to Schein about several issues does not mean that she did not speak to Schein about the one described in the affidavit. The statements are not so contradictory that they are due to be struck.

Paragraph 9 of the Crane affidavit states that, in September 1998, Robin Wells was the

16

General Manager. (Crane Aff. at ¶ 9). According to the defendant, Crane states in her deposition that Wells was hired after she returned to work with defendant. (Doc. 32, *citing* Crane Depo. at 36).[17] Wells actually began working for the defendant in December of that year. (Schein Depo. at 14). So far as the defendant asserts that Crane's affidavit is inconsistent, the court does not find the inconsistencies to be such that the testimony should be struck. These differences go more to the weight to be given the evidence by the jury.

Crane states in her affidavit, "Scott began to give me explicit details of his alleged sex life." (Crane Aff. at ¶ 10(d)). In her deposition, Crane states that Scott revealed this information to her and others. (Crane Depo. at 95, 98). The defendant contends that these statements are contradictory. (Doc. 32 at 5). Because Crane ("me") is part of the same audience described in the Crane deposition, the statements are not contradictory. The only way the statements could be contradictory would be if Crane, in her deposition, stated that Scott revealed the information to others but not to her. The statements are consistent. In the same paragraph the defendant also asserts that the phrase "for a period of time," which was used in the affidavit concerning Scott telling her about his purported relationship with a customer, is contradictory of the phrase "about a week or so," which was used in the deposition. (Crane Aff. at 5; Crane Depo. at 96). "[A]bout a week or so" can be "a period of time" and, therefore, the statements are not contradictory.

Crane, in the same paragraph of her affidavit also alleges that Scott's antics were the main topic of discussion at the smoking area and the sales desk. (Crane Aff. at ¶ 10). The defendant states, "Plaintiff testified in her deposition that these topics were his, meaning Scott's, main topics of conversation at the smoking pole and the sales desk." (Doc. 32 at 5). Because

---

[17] Page 36 of the deposition was not included in the defendant's exhibits.

*Scott's* topic could be *the* topic of discussion, the statements are not contradictory.

Crane states in her affidavit that she observed Scott and other male employees participating in cybersex when she went in Scott's office to close deals and also when she looked in Scott's office through a glass wall. (Crane Aff. at ¶ 10(e)). Crane's deposition states that she observed the cybersex through the glass wall. (Crane Depo. at 103-04). The defendant believes these statements are contradictory. (Doc. 32 at 6). The court has examined the statements in the affidavit and the deposition testimony and does not find them to be contradictory so as to warrant exclusion at this juncture.

Crane states in her affidavit that she was "forced" to stay after hours to complete a deal. (Crane Aff. at ¶ 10(e)). The defendant states that, because Crane did not allege this fact in her deposition, it is contradictory to the affidavit statement. (Doc. 32 at 6, *citing* Crane Depo. at 108-09). It may be possible for an omitted statement to contradict an earlier statement, but that is not the case here. Crane's failure to state she was forced to stay after hours in her deposition cannot be read as a contradiction of her prior deposition testimony. The court sees her being "forced" to mean that the need to close a deal and collect the concomitant commission warranted her staying at the dealership after normal hours.

Crane states in her affidavit that Wells failed to take action in response to her complaints about the pornographic picture. (Crane Aff. at ¶¶ 10(f) & (g)). To the contrary, she states that he laughed. (*Id*. at ¶ 10(g)). In her deposition, Crane acknowledges that she was never shown another pornographic picture after the complaints. (Crane Depo. at 116). The defendant asserts that these statements are contradictory and should be stricken. (Doc. 32 at 6). Crane's affidavit is not inconsistent with her deposition and, therefore, is not due to be stricken.

18

Crane states in her affidavit that she saw Casey Pilgrim show the altered pornographic picture to other employees, including Gail Castleberry. (Crane Aff. at ¶ 10(g)). In her deposition, Crane states that she saw Scott show the original pornographic picture to employees. (Doc. 32 at ¶ 15, *citing* Crane Depo. at 109-11).[18] She further testified that she was not present when they showed "the other one" to other employees. (*Id.*). Defendant moves to have this portion of the affidavit stricken for being contradictory to the statement in the deposition. (Doc. 32 at 7). These statements are not contradictory because they involve different people and different pictures.

Crane claims in her affidavit that male salespeople refused to split commissions with her. (Crane Aff. at ¶ 10(h)). In her deposition, Crane identified only David Hollingsworth as a person who would not split commissions with her. (Crane Depo. at 49-50). The defendant alleges that these statements are contradictory and should be stricken. (Doc. 32 at 7). However, the defendant fails to note that the statement about David Hollingsworth was in response to a question that asked for a specific instance of such a refusal. (Crane Depo. at 49-50). The question did not ask for an exhaustive list of instances where male salespersons refused to split commissions. The statement is not due to be stricken.

With regard to Crane's affidavit statement that Hollingsworth would not split a commission with her, the defendant further asserts that this is in direct contradiction to deposition testimony stating that Hollingsworth did in fact split the commission but would not split the money from General Motors. (Doc. 32 at ¶ 17, *citing* Crane Depo. at 50). It would appear that the GM money was part of the commission and, therefore, the statements are not

---

[18] Pages 110-11 of Crane's deposition were not in the defendant's exhibits.

19

contradictory.

Finally, in her affidavit, Crane repeats alleged statements by Joe Glass to the effect that Scott had called her a "whore" and a "bitch." (Crane Aff. at ¶ 10(l)). The defendant moves to strike this statement because Crane has no personal knowledge of the statement and the statement is hearsay. (Doc. 32 at 7-8). Crane asserts that Glass's statement, as an employee of the defendant, is an admission of a party opponent and admissible on those grounds. (Doc. 38 at 20). Federal Rule of Evidence 801(d)(2) states:

> **(2) Admission by party-opponent**. The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) *a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship,* or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority under subdivision (C), the agency or employment relationship and scope thereof under subdivision (D), or the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).

FED. R. EVID. 801(d)(2) (emphasis added). Premised on the evidence before the court, the undersigned cannot conclude that the complained-of statements by Glass fit within the parameter argued by the plaintiff. However, "[i]n considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form." *Denney v. City of Albany*, 247 F.3d 1172, 1190 n.10 (11th Cir. 2001) (*citing Pritchard v. Southern Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996)); *see McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (otherwise admissible evidence may be submitted in an inadmissible form at the summary judgment stage), *aff'd*, 520 U.S. 781, 117 S. Ct. 1734, 138 L. Ed. 2d 1

(1997). This evidence could be presented in an admissible form at trial by Glass, and, therefore may be considered on the defendant's motions.[19]

### B. Gail Castleberry

The defendant has moved to strike portions of Castleberry's affidavit. (Doc. 33 at 2). Paragraph 4 of Castleberry's affidavit recounts a "rumor" that Glass had been involved with a former female employee who was killed by her husband. (Castleberry Aff. at ¶ 4). The defendant argues the statement is hearsay and not based on required personal knowledge. (Doc. 33 at ¶ 1). The plaintiff responds that the statement is not being offered for the truth of the matter asserted (whether the described events actually happened). It is being offered to show why she was given the position of Used Car Manager. (Doc. 38 at 3). Castleberry also asserts that the evidence is offered to illustrate that Glass is not a valid comparator with Castleberry. (*Id.*). The situation with Glass has no relevance to the issues before the court on the motion for summary judgment and will not be considered.

Crane, in her affidavit, states that Wells told her that "with Mandy's murder, he had to let Glass go." (Castleberry Aff. at ¶ 5). The plaintiff, in her deposition, states that Wells mentioned Mandy's murder only in response to plaintiff's comment that Glass seemed nervous all the time. (Castleberry Depo. at 69). The defendant moves to strike the affidavit statement for being contradictory of the deposition statement. (Doc. 33 at 3). Specifically, the defendant asserts that Wells did not connect the murder with the decision to terminate Glass. The statements are not contradictory because the affidavit statement does not refute the truth of the deposition testimony.

---

[19] The court does note that the testimony may be objectionable on other grounds at trial.

Castleberry, in her affidavit, alleges that she performed her job in accordance with a plan, which Wells agreed with when Castleberry and Wells discussed the Used Cars Manager's position. (Castleberry Aff. at ¶ 8). In her deposition, Castleberry states that Wells agreed with her assessment of the inventory and sales problems. (Castleberry Depo. at 68). The defendant moves to strike the affidavit statement as being contradictory to the deposition statement. (Doc. 33 at 3). The statements are not contradictory to the extent that they should be stricken.

The Castleberry affidavit also states that the plaintiff "continu[ed] to move units" in February, March, and April of 1999. (Castleberry Aff. at ¶ 8). The plaintiff, in her deposition, states that she does not know how many used cars were sold while she was the Used Car Manager and she acknowledges never having looked at the figures for her department. (Castleberry Depo. at 75, 82-83). The defendant moves to strike the affidavit statement for being contradictory to the deposition. (Doc. 33 at 3). Castleberry may have acknowledged that she is unaware of the numerical figures for her department, but this admission does not contradict her belief that she "continu[ed] to move units." (Castleberry Aff. at ¶ 8). It simply reflects the basis, or lack thereof, for her affidavit statement.

Paragraph 9(d) of the Castleberry affidavit describes an incident where a woman sent Scott a naked picture over the Internet and Scott showed the picture to Castleberry. (Castleberry Aff. at ¶ 9(d)). Paragraph 9(e) of the Castleberry affidavit begins with the phrase "Following the above incident" to introduce another incident in which Casey Pilgrim changed the heads on the picture and showed it to her again. (Id. at ¶ 9(e)). The defendant states that both incidents occurred on the same night and, therefore, were the same incident. (Doc. 33 at 4). Because they are a continuous incident, but separated in the affidavit to two distinct incidents, they are alleged

to be contradictory. (*Id.*) This argument is simply not logical and the statements should not be stricken. The plaintiff's choice of words in the affidavit does not make the statements contradictory or misleading.

Castleberry alleges in her affidavit that Wells, when he removed her from the manager's position, stated only the probability of employment at the Chrysler store. (Castleberry Aff. at ¶ 13). In her statement to the EEOC, Castleberry stated that she was told she "could either go into sales or move to another division." (Castleberry Depo. at Ex. 3). The defendant alleges these statements are contradictory and moves to strike the affidavit statement. (Doc. 33 at 4). The plaintiff's affidavit statement is not a statement to the effect that she could not attain employment at the Chrysler store. It simply uses different language and reflects a lack of confidence that a new job was a sure thing. The statements are not contradictory.

Finally, Castleberry states in her affidavit that she went to the Chrysler dealership to inquire about working in that store. (Castleberry Aff. at ¶ 13). When nobody would see her, she just left. (*Id.*) Castleberry states in her deposition that she tried to speak with a manager, but he was with a customer and told her to wait and speak with Mr. Schein. (Castleberry Depo. at 110-12). The defendant moves to strike the affidavit statement as being contradictory to the sworn deposition testimony. Clearly, when Castleberry stated in her affidavit that nobody would speak to her, she was stating that nobody would speak to her about the job. Although the plaintiff's language in the affidavit is stronger, it cannot be said that the statements are so contradictory that the affidavit statement should be struck.

## III. MOTIONS FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; *See* FED. R. CIV. P. 56(a) and (b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

24

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 259. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

The court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of jury and, therefore, the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*,

25

477 U.S. at 255.  The nonmovant need not be given the benefit of every inference but only of every reasonable inference.  *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).  "If reasonable minds could differ on the inferences arising from the undisputed facts, then a court should deny summary judgment."  *Allen v. Tyson Foods*, 121 F.3d 642 (11th Cir. 1997).

### B. Hostile Environment Sexual Harassment

The plaintiffs both assert hostile work environment claims premised on sexual harassment.  "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 1001, 140 L. Ed. 2d 201 (1998).  To establish a claim for a hostile or abusive working environment, an employee must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment. . . ; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000), *cert. denied*, 531 U.S. 1076, 121 S. Ct. 772, 148 L. Ed. 2d 671 (2001) (*citing Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc), *cert. denied*, 529 U.S. 1068, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000)).  In *Gupta*, the Eleventh Circuit stated:

> The fourth element . . . is the element that tests the mettle of most sexual harassment claims.  Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere "general civility code."  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

*Gupta*, 212 F.3d at 583.  Title VII may include a prohibition of sexual harassment, but it is

clearly not a federal civility code. *Mendoza*, 195 F.3d at 1245.

"Title VII 'does not prohibit all verbal or physical harassment in the workplace,' and 'does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex.' Instead, Title VII prohibits on the type of severe or pervasive sexual harassment that 'alter[s] the conditions of the victim's employment.'" *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (*quoting Oncale*, 523 U.S. at 80-81).

In *Mendoza*, the Eleventh Circuit, sitting en banc, reiterated the standards applicable to hostile environment claims:

> Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component. . . . . The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. The environment must be one that a reasonable person would find hostile or abusive and that the victim subjectively perceives to be abusive. Furthermore, the objective severity of the harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.
>
> The objective component of this analysis is somewhat fact intensive. . . . The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.

*Mendoza*, 195 F.3d at 1246 (internal quotations and citations omitted). The Supreme Court in *Faragher* stated, "We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment . . . ." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2284, 141 L. Ed. 2d 662 (1998) (*citing Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577-78 (2nd Cir. 1989); *Moylan v. Maries County*, 792 F.2d 746, 749-50 (8th

Cir. 1986).

### 1. Robin Crane

Crane alleges that the facts are sufficient to meet the burden described in *Faragher* and *Gupta*. Crane is a member of a protected class. She was continuously spoken to and, on at least two occasions, was touched in a manner that could reasonably be considered harassment by a jury. She asserts that the instances described by her were sexual in nature and collectively were severe and pervasive enough to state a claim. Because Scott was acting as a manager of the defendant at the times of the incidents, she asserts that the defendant car dealership is liable for damages caused by the behavior. Thus, she asserts that the motion for summary judgment is due to be denied as to this claim

The defendant initially asserts that Crane failed to meet the EEOC 180-day deadline for filing a claim of unlawful employment discrimination regarding events that occurred during Crane's first period of employment. (Doc. 22 at 17). "Generally, an aggrieved employee may not obtain relief for any alleged discrimination occurring more than 180 days before he filed his administrative charge with the EEOC. *See* 42 U.S.C. § 2000e-5(e). An exception to the 180-day filing requirement arises when the discriminatory act constitutes a 'continuing violation' of the statute. *See Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 796 (11th Cir. 1992)." *Williams v. Alabama Indus. Dev't. Tr'g.*, 146 F. Supp. 2d 1214, 1219 (M.D. Ala. 2001). "An employee cannot use one timely-filed EEOC charge as a bootstrap for lapsed claims arising out of other remote, discrete events. *See Carter v. West Publ'g Co.*, 225 F.3d 1258, 1263-65 (11th Cir. 2000).

The plaintiff concedes the defendant's argument on this point. In a note to the plaintiffs'

28

opposition brief, Crane states that she "does not bring any claims as to the first period of employment with the defendant. Rather, the description of this period of employment is offered as background evidence." (Doc. 30 at 2, n.2). Accordingly, the court deems her claims to be premised on the conduct during her second period of employment with Schein.

In its motion, the defendant asserts that Crane's claim is due to be dismissed premised on four distinct reasons: (1) she "cannot establish that the conduct to which she was subjected was unwelcomed;" (2) she "cannot establish that the alleged harassment was based on sex;" (3) "the harassment complained of by [the] plaintiff was not sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment;" and, (4) the defendant "exercised reasonable care to prevent and correct promptly any sexually harassing behavior and because [the] plaintiff unreasonably failed to take advantage of the preventive and corrective opportunities provided by the defendant and to avoid harm to others." (Doc. 22 at 16).

### a. Not Unwelcomed

The defendant argues that Scott's behavior was not unwelcomed. (Doc. 22 at 18). To support this contention, the defendant alleges several instances where Crane herself engaged in inappropriate conduct. (Doc. 22 at 18). Crane apparently used foul language (including f-- k), she hugged other employees, and discussed her own body in front of others. (Crane Depo. at 42, 161-62, 171, 175-76). However, it would be difficult to conclude, based upon these incidents, that Crane welcomed Scott's conduct when he grabbed her buttocks, spoke about her rear end to other employees, or displayed pornographic pictures. (Crane Depo. at 91-92; Crane Aff. at 5). The unwelcomed nature of the conduct is illustrated by Crane's complaints to Scott, Weinberg,

29

Wells, and Schein.  (Crane Aff. at ¶¶ 6-7, 10(g), 13, 16; Schein Depo. at 62-63).

### b.  Not Based on Sex

The defendant next argues that Scott's alleged harassment was not based on sex.  (Doc. 22 at 19).  Not all of Scott's conduct was based on sex.  Suffice it to say, however, that Scott's conduct, when he grabbed Crane, displayed pornographic pictures, continually discussed his sexual encounters, and discussed Crane's body with others, had a sexual component to it.  The defendant makes the point that much of the conduct was directed at both males and females.  However, the fact that Scott's behavior may have been directed to men at times does not change the fact that other more significant conduct was directed at the plaintiff.  There is no evidence, for instance, that he grabbed the buttocks of other male employees.

### c.  Not Severe and Pervasive

The defendant then argues that the alleged harassment is not severe and pervasive enough to alter the terms and conditions of plaintiff's employment.  (Doc. 22 at 20).  "The courts should examine the conduct in context, not as isolated acts, and determine under the *totality of the circumstances* whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment."  *Mendoza*, 195 F.3d at 1246 (emphasis added).  The defendant alleges that Crane was shown only one picture and that "the majority of the conduct was not directed to her and did not involve her."  (Doc. 22 at 21).  However, even though the incidents individually may not constitute a Title VII claim, together they are significant for the purposes of summary judgment.

At the hearing on the motion, counsel for the defendant properly directed this court to *Mendoza* and the litany of case examples discussed therein where courts have found the conduct

to be insufficient.  Specifically, the *Mendoza* court cited the following:

> Other circuits have applied these factors to delineate a minimum level of
> severity or pervasiveness necessary for harassing conduct to constitute
> discrimination in violation of Title VII.  Many decisions throughout the circuits
> have rejected sexual-harassment claims based on conduct that is as serious or
> more serious than the conduct at issue in this appeal.  *Shepherd v. Comptroller of
> Public Accounts of Texas*, 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that
> several incidents over a two-year period, including comment "your elbows are the
> same color as your nipples," another comment that plaintiff had big thighs,
> touching plaintiff's arm, and attempts to look down the plaintiff's dress, were
> insufficient to support hostile-environment claim); *Indest v. Freeman Decorating,
> Inc.*, 164 F.3d 258, 264-67 (5th Cir. 1999) (noting it was "dubious" whether
> several sexually oriented comments and gestures and an implied threat of
> retaliation for refusing a sexual advance would be sufficient to establish a hostile
> environment); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2nd Cir.
> 1998) (holding that statement that plaintiff had the "sleekest ass" in the office plus
> single incident of "deliberately" touching plaintiff's "breasts with some papers
> that he was holding in his hand" were insufficient to alter the terms or conditions
> of the plaintiff's employment); *Adusumilli v. City of Chicago*, 164 F.3d 353, 357
> (7th Cir. 1998) (holding actions insufficient to support hostile environment claim
> where co-employees teased plaintiff, made sexual jokes aimed at her, asked her
> what "putting one rubber band on top and another on the bottom means,"
> commented about her low neck tops, repeated staring at her breasts with attempts
> to make eye contact, and four incidents of touching her arm, fingers or buttocks);
> *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365-66 (10th Cir. 1997)
> (holding five "sexually-oriented, offensive" statements over sixteen months
> insufficient to show hostile environment, even though one of the harasser's
> statements occurred while he put his arm around plaintiff, looked down her dress
> and said, "well, you got to get it when you can"); *Galloway v. General Motors
> Serv. Parts Operations*, 78 F.3d 1164, 1167-68 (7th Cir. 1996) (holding offensive
> comments including repeatedly calling the plaintiff a "sick bitch" insufficient
> under Harris because not necessarily gender-related); *Hopkins v. Baltimore Gas &
> Elec. Co.*, 77 F.3d 745, 753-54 (4th Cir. 1996) (holding evidence that the harasser
> "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's]
> crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the
> receiving line at [a] wedding, and stared at him in the bathroom" insufficient to
> establish violation of Title VII); *Black v. Zaring Homes, Inc.*, 104 F.3d 822,
> 823-24 (6th Cir. 1997) (reversing jury verdict and finding conduct was "sex-based"
> but insufficiently severe or pervasive to state actionable claim, where conduct
> over a four-month period involved repeated sexual jokes; one occasion of looking
> plaintiff up and down, smiling and stating, there's "Nothing I like more in the
> morning than sticky buns"; suggesting land area be named as "Titsville" or "Twin
> Peaks"; asking plaintiff, "Say, weren't you there [at a biker bar] Saturday night

dancing on the tables?"; stating, "Just get the broad to sign it"; telling plaintiff she was "paid great money for a woman"; laughing when plaintiff mentioned the name of Dr. Paul Busam, apparently pronounced as "bosom"); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (holding insufficiently severe or pervasive to support a hostile-environment claim nine instances of offensive behavior over seven months including repeated references to plaintiff as a "tilly" and a "pretty girl" and one instance of simulated masturbation); *Kidwai v. McDonald's Corp.*, No. 93-1720, 1994 WL 136971 (4th Cir. 1994) (holding insufficient under Harris seven incidents, including one instance in which harasser asked plaintiff whether "she was in bed with someone"); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (holding plaintiff's claims--supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work--were not sufficient for actionable sexual harassment); *see also DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995) ("A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace."); *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.").

*Mendoza*, 195 F.3d at 1246-47. The court went on to state the following:

> In this appeal, the conduct alleged by Mendoza falls well short of the level of either severe or pervasive conduct sufficient to alter Mendoza's terms or conditions of employment. Construing the evidence in the light most favorable to Mendoza, she presented evidence of four categories of harassing conduct: (1) one instance in which Page said to Mendoza "I'm getting fired up"; (2) one occasion in which Page rubbed his hip against Mendoza's hip while touching her shoulder and smiling; (3) two instances in which Page made a sniffing sound while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and (4) Page's "constant" following and staring at Mendoza in a "very obvious fashion."

> As an initial matter, whether Page's conduct testified to by Mendoza includes the necessary sexual or other gender-related connotations to be actionable sex discrimination is questionable. . . .

*Id.* at 1247.

In *Gupta*, the complained-of conduct consisted of the following acts over a six to seven month period: (1) "look[ing her] up and down," (2) suggesting lunch at Hooters restaurant, (3) suggesting that she "change into casual attire before dinner," (4) accompanying her and another couple to "a place where single people meet," (5) offering assistance if she needed anything, (6) changing her office to one across from the alleged harasser when she complained her office was too small, (7) offering to drop food at her house, (8) calling her at home two or three times a week late at night and asking if she was in bed, (9) asking if she had a boyfriend, (10) asking her to lunch, (11) calling other faculty members "racist" and "evil," (11) putting a hand on her thigh in the office, (12) touching her bracelet and saying, "Oh, it is a very nice bracelet," (13) touching her ring, (14) touching and lifting the hem of her dress and commenting, "What kind of material is that?," (15) on a hot day when the air conditioning was broken, Gupta walked into the alleged harasser's office when he was expecting her and he had taken off his dress shirt and was wearing an undershirt and "he unbuckled his belt and pulled down his zipper and start[ed] tucking his [dress] shirt in, (16) making comments that she was "looking very beautiful" and that "Indian people are really decent, and the Caribbean and Western people are really promiscuous" and stating that he could tell that she was "innocent and [ ] didn't have much experience," (17) after a storm, commenting that she should have called him since she was alone and he would have spent the night,[20] and (18) other looks that made her uncomfortable. *Gupta*, 212 F.3d at 578-79.

After a jury rendered a verdict for the plaintiff, the Eleventh Circuit held that the evidence did not support a finding of harassment from an objective viewpoint. Specifically, the court

---

[20] Gupta understood this as a suggestion "that he wanted to [have a] sexual relationship with [her]." *Gupta*, 212 F.3d at 579.

stated:

Except for the phone calls to her home, none of Rhodd's conduct can be described as frequent. Gupta testified that Rhodd phoned her often at 9:30 or 10:00 at night, and over the weekends, and sometimes asked her personal questions during these phone calls. [ ] While Gupta testified that these phone calls were frequent, she never contended that they were intimidating or threatening. At no point during these phone calls did Rhodd ask Gupta for a date or make sexually explicit remarks or innuendos. [ ] Neither the content of Rhodd's remarks nor the number of the phone calls suggests obsessive or stalker-like behavior by Rhodd. While frequently calling an employee at home and making even innocuous inquiries may be annoying or inappropriate behavior, it does not equal severe or pervasive sexual harassment--if it is sexually harassing conduct at all. As for Rhodd's comments about the promiscuity of people from Jamaica as compared to the innocence of people from India, and the opinion he expressed of women, those statements were far from laudatory, but they were also isolated utterances over a period of several months.

. . . . Gupta did not contend that Rhodd made any inappropriate gestures or comments toward her when he tucked in his shirt. His conduct on this isolated occasion was not "physically threatening or humiliating." . . . .

. . . . Gupta cannot establish her hostile environment claim with allegations that Rhodd stared at her twice, touched her ring and bracelet once, and kept asking her to lunch. Assuming it was sexual in nature, none of that conduct was severe, threatening, or humiliating. As the Supreme Court has observed, in a normal office setting interaction between employees is to be expected. . . . . What one employee might perceive as conduct which crosses the proverbial line, another might perceive as banter. We cannot mandate that "an employer [ ] be required under pain of legal sanctions to ensure that supervisors never look or stare at a subordinate whom they are supervising in such a way that she might think they are 'coming on' to her." . . . . Nor can we mandate that an employer be required to ensure that supervisors never touch employees on the hand or finger or ask them to lunch.

Of all the conduct about which Gupta complains, the most serious is Rhodd's placing his hand on her knee once, and his touching the hem of her dress once. He should not have done either of those things. But those were only two incidents in a period of six or seven months during which they were interacting (out of an even longer period during which the two worked for the University). Each incident was only momentary, and neither was coupled with any verbal suggestions or advances. . . .

. . . . The standard does have an objective component, and applying it we

34

conclude that the conduct and statements in question would not have interfered with a reasonable employee's performance of her job.

We are aware of our duty to examine and consider all of the behavior and conduct of a sexually or gender-related nature collectively in determining whether it meets the "sufficiently severe or pervasive" requirement. We have done so, and it does not. The alleged harassment in this case exemplifies "the ordinary tribulations of the workplace," *Faragher*, 524 U.S. at 788, 118 S. Ct. at 2284, which the Supreme Court and this Court have held do not constitute actionable sexual harassment. Gupta failed to present evidence that Rhodd's conduct was in any way "physically threatening or humiliating," or that a reasonable person would view the conduct as "severe." *Mendoza*, 195 F.3d at 1246. The Fifth Circuit recently opined, "All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment." *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999) (citations omitted). This is not such a case.

Furthermore, a finding that Gupta's complaints constitute sexual harassment would lower the bar of Title VII to punish mere bothersome and uncomfortable conduct, and would "trivialize true instances of sexual harassment." *Mendoza*, 195 F.3d at 1252 n.10. Based upon *Mendoza*, we hold that there was insufficient evidence presented at trial to support the jury's verdict finding the Board liable for hostile environment sexual harassment under Title VII, and we reverse the judgment of the district court on that claim.

In a more recent case, *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501 (11th Cir. 2000), the Eleventh Circuit reversed the granting of a motion for summary judgment. The plaintiff claimed that she was sexually harassed when (1) Donnell repeatedly commented that Johnson had a sexy voice; (2) Donnell called out Johnson's name and winked at her; (3) Donnell called out Johnson's name and pulled his pants up in an obscene manner, revealing an imprint of his private parts; (4) Donnell called out Johnson's name and then looked her "up and down" while staring at her in a sexual manner; (5) Donnell said "Johnson, I like you and as long as I like you you're going to be all right. You don't have to worry about your job;" (6) Donnell repeatedly attempted to massage Johnson's shoulders against her wishes;

(7) Donnell stuck his tongue out at Johnson in an obscene manner; (8) Donnell inappropriately

rubbed his body parts against Johnson; (9) Donnell asked Johnson why a person with a body like

hers always covered it up; (10) Donnell commented that he could "pull [Johnson] up" anytime, a

comment Johnson interpreted as a sexual reference; (11) Donnell got close to Johnson's face as if

to kiss her; (12) Donnell commented that Johnson "really knocked him off his feet;"

(13) Donnell stated that "he had to stay on his side of the room;" (14) Donnell commented

inappropriately about sex to Johnson and questioned Johnson about her sex life; and

(15) Donnell asked Johnson if she ever got lonely. *Johnson*, 234 F.3d at 506.  The court stated:

> There is no doubt Johnson subjectively perceived Donnell's behavior as
> harassing.  Turning to the four objective factors: the conduct alleged by Johnson
> was not infrequent (Johnson points to roughly fifteen separate instances of
> harassment over the course of four months); the conduct was severe (Donnell's
> behavior included giving Johnson unwanted massages, standing so close to
> Johnson that his body parts touched her from behind, and pulling his pants tight to
> reveal the imprint of his private parts); the conduct was physically threatening and
> humiliating (same); and the conduct interfered with Johnson's job performance
> (she could not get along with her on-the-air co-host).  This set of facts differs from
> cases like *Mendoza* and *Gupta v. Florida Bd. of Regents*, where there were fewer
> instances of less objectionable conduct over longer periods of time.  *See Mendoza*
> 195 F.3d at 1242-43; *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 585 (11th
> Cir. 2000).  The facts of this case are more akin to the "continuous barrage of
> sexual harassment" in *Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417,
> 418 (11th Cir. 1999).

*Id.* at 509.  In *Dees*, the conduct consisted of the following:

> sexually explicit stories and jokes, to comments about her body or those of male
> firefighters, to physical harassment.  On one particularly humiliating occasion,
> Jacobs asked Dees to sit on his lap.  When she refused, Jacobs picked her up and
> squeezed her so hard that she urinated in her pants.  Jacobs, laughing, then told the
> other firefighters what had happened.  On another occasion, Stewart ground his
> groin into Dees' buttocks after stating "look at that sexy mama, I could just eat
> you in that skirt."  Rainey propositioned Dees on a number of occasions,
> whispering in her ear that she was "the kind of woman I like; you're not only
> beautiful, you're hot-blooded," or telling her that she needed a "sugar daddy" and
> that with a body like hers, she would not have to work if she listened to him.  On

numerous other instances, the four men grabbed or slapped Dees' buttocks,
groped her leg, or otherwise touched her in a sexually suggestive manner.

*Dees*, 168 F.3d at 418-19.  The *Dees* court noted in *dicta* that "it is evident both that Dees

subjectively found her work environment abusive, and that a reasonable person would find it so."

*Id.* at 422 n.12.

The conduct in the present case does not fit squarely within the parameters of any of the

foregoing cases.  The incidents in *Mendoza* were less severe.  Many of the comments in *Mendoza*

arguably were not sexual or gender-related.  *Mendoza* involved only slight touching, while this

case involves at least two occasions of purposeful contact.  Although there were numerous

instances in *Gupta*, many were not sexual or gender-related.  Each incident of touching in *Gupta*

"was only momentary, and neither was coupled with any verbal suggestions or advances."

*Gupta*, 212 F.3d at 585.  *Johnson*, involved much more significant and physical contact.  The

court described the conduct as "physically threatening and humiliating" and interfering with the

plaintiff's ability to work.  *Johnson*, 243 F.3d at 509.  The conduct in *Dees* was much more

severe.  It was focused directly at the plaintiff, it was extensive, and it involved physical

touching.  Premised upon application of these authorities to the present facts, the court cannot

conclude as a matter of law that the complained-of conduct is not sufficiently severe to support

Crane's claim.[21]

### d. Employer Liability

The defendant next argues that it is not liable for the alleged sexual harassment because it

_____

[21] In support of her claim, counsel for the plaintiff cites *Blakey v. Continental Airlines, Inc.*, 1997 U.S. Dist. LEXIS
22068 (D.N.J. 1997), where the court held that employee conduct that resulted in a female pilot being forced to observe
pornographic pictures was sufficient to overcome a motion for summary judgment.  The court finds the facts in *Blakey*
distinguishable from those in this case.  The number of instances involving pornography were substantial in *Blakey* unlike the
present case.

exercised reasonable care to prevent and correct any harassing behavior and because the plaintiff failed to take advantage of the preventative measures that were available. (Doc. 22 at 22). To support this argument, the defendant notes that it had a policy in place that prohibited sexual harassment. (Schein Depo. at Ex. 1). The defendant also believes that Crane could have contacted Schein or refused to go around the smoking area, where many of the sexual discussions took place. (Doc. 22 at 23).

As already discussed, Crane alleges that she complained to many persons who were in managerial positions. (Crane Aff. at ¶¶ 6-7, 10(g), 13, 16; Schein Depo. at 62-63). That course of action is consistent with the Schein harassment policy, which states, "If, at any time, you feel you are the recipient of . . . harassment, you are encouraged to immediately notify either your immediate supervisor, or arrange for a meeting with Susan Schein to discuss the problem." (Schein Depo., Ex. 1, p. 11).[22] Given Crane's alleged complaints and the deferential character of a summary judgment analysis, defendant's argument is insufficient as a matter of law at this juncture.

### e. *Ellereth/Faragher* Affirmative Defense

Under *Burlington Industries, Inc. v. Ellereth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998), the defendant asserts that summary judgment is due to be granted because Crane unreasonably failed to take advantage of the preventive and corrective opportunities provided the defendant and to otherwise avoid harm. (Doc. 22 at 22). To advance this defense the defendant must show the following:

---

[22] Located at document 23, exhibit 3, p. 11.

38

(a) [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and

(b) [the] plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellereth,* 524 U.S. at 765, 118 S. Ct. at 2270.  The effective promulgation of a workable anti-harassment policy may satisfy the first element's reasonable care standard.  *See Faragher*, 524 U.S. 807-08, 118 S. Ct. at 2293 (formal sexual harassment policy with sensible complaint procedure satisfies employer's duty of care).

The defendant's sexual harassment policy contained a grievance procedure and directed harassed employees to complain to their supervisor or Susan Schein.  (Doc. 23, Ex. 3, p. 11). The plaintiff asserts that the defendant has not met the elements because she did report her complaints to management, including Schein, and they were not effectively addressed; thus making the policy ineffective.  The defendant counters that "it is undisputed that plaintiff did not notify Schein of all of those acts about which she is now complaining, although she felt comfortable complaining to Schein at the office and at home."  (Doc. 22 at 23 *citing* Crane's Depo. at 158-59, 198-99).

Reviewing the record in a light most favorable to the plaintiff, the court must conclude that the defendant is not entitled to summary judgment on this issue as a matter of law.  Crane testified that Wells told her not to complain to Schein.  (Crane Depo. at 198).  Despite this, she in fact did complain to Schein at work.  (*Id.*).  She also called her at home.  (*Id.*).  Crane stated that

she called Schein "[o]n several occasions." (*Id*. at 199).[23]

### 2. Gail Castleberry

The defendant asserts that Castleberry's hostile environment claim is due to be dismissed premised on the same four reasons that were asserted concerning Crane's claim: (1) she "cannot establish that the conduct to which she was allegedly subjected was unwelcomed;" (2) she "cannot establish that the alleged harassment was based on sex;" (3) "the harassment complained of by [the] plaintiff was not sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment;" and, (4) the defendant "exercised reasonable care to prevent and correct promptly any sexually harassing behavior and because [the] plaintiff unreasonably failed to take advantage of the preventive and corrective opportunities provided by the defendant and to avoid harm otherwise." (Doc. 25 at 11).

In support of her claim, Castleberry asserts that she learned that several female employees and Scott referred to her as a "lesbian" or "dyke;" (Castleberry Aff. at ¶ 9(a)); she had one incident with Wells over her decision to "mark" another employee as absent (*id*. at ¶ 9(b)); she observed Scott on computer "chat rooms" communicating with other women about "sexual topics"(*id*. at ¶ 9(c)); Scott downloaded a picture of a naked woman that he showed to Crane and asked her (Castleberry) to come see it (*id*. at ¶ 9(d)); she was aware that Pilgrim changed the head on the photograph with the heads of other women at work, including Castleberry (*id*. at ¶ 9(e)); she heard Scott talk about his sexual escapades with a customer (*id*. at ¶ 9(f)); she heard him state that he wore Pampers or Depends to ball games so he would not have to go to the bathroom (*id*.

---

[23] The court also notes that the record demonstrates that the defendant was aware of Scott's conduct even before the plaintiff returned the second time because she had complained to Schein and Glass told her when he was attempting to get her back to the dealership that Schein had Scott on a "short leash." (Crane Aff at ¶ 7). Similarly, Schein told Crane that she was aware of what was going on and it was going to stop. (*Id*.).

at ¶ 9(g)); she heard him state that he defecated in the shower while he and his wife were taking a shower (*id.* at ¶ 9(h)); Scott referred to Crane as a "whore" and talked about her butt (*id.* at ¶ 9(i)); and, Scott referred to her breasts as "tits" (*id.* at ¶ 9(j)).[24]

### a. Not Unwelcomed

The defendant argues that Scott's behavior was not unwelcomed. (Doc. 25 at 20).  To support this contention, the defendant alleges several instances where Castleberry herself engaged in inappropriate conduct. (*Id.*).  Castleberry apparently used foul language, she told Scott to refer to her "breasts" as "puppies" or "pups" when he was using other terms, and she commented about going to the penitentiary to get another husband. (Castleberry Depo. at 98-99). In support of this argument, the defendant cites to *Reed v. Shepard*, 939 F.2d 484 (7th Cir. 1991); *Tindall v. Housing Authority*, 762 F. Supp. 259 (W. D. Ark. 1991); *Weinsheimer v. Rockwell International Corp.*, 754 F. Supp. 1559 (M.D. Fla. 1990), *aff'd*, 949 F.2d 1162 (11th Cir. 1991); *Ukarish v. Magnesium Elektron*, 1983 WL 593, 31 FEP 1315 (D.N.J. 1983).  *Reed* is clearly distinguishable.  In that case, the court found that the plaintiff "not only experienced this depravity with amazing resilience, but she also relished reciprocating in kind."  She was put on probation for her use of offensive language, she was instructed to suspend an "exhibitionistic habit she had," she also participated in suggestive gift giving, she enjoyed exhibiting to the male officers the abdominal scars she received from her hysterectomy which necessarily involved showing her private area.  *Reed*, 939 F.2d at 486-87.  The defendant is correct that in *Tindall*, the court found for the defendants at trial, stating, "Some of the witnesses testified, moreover, that

---

[24] In response to this last comment, she "jokingly responded that he [(Scott)] should not call them that, but he should call them puppies . . . ." (Doc. 31 at ¶ 9(j)).

Ms. Phelan acted like 'one of the boys' and freely joined in sexual jokes with the men."

However, that finding was made, along with many others, after a trial, not on summary judgment.

*Tindall*, 762 F. Supp. at 263.  In *Weinsheimer*, the court stated:

> The clear weight of the testimony indicates that such banter was engaged in by
> generally all employees, male and female alike.  Although denied by the plaintiff,
> strong evidence, as testified to by virtually every one of her co-workers, further
> supports the view that she was among the most prevalent and graphic participants
> in this overall atmosphere.

*Weinsheimer*, 754 F. Supp. at 1563-64.  *Weinsheimer* is again factually and procedurally

distinguishable from the present one.  Similarly, *Ukarish*, is factually and procedurally

distinguishable from this case as well.[25]

Although Castleberry's actions are not laudatory, the court cannot conclude that they are

such that summary judgment is due to be granted the defendant.  Her actions did not "welcome"

the complained-of conduct, particularly the actions of Scott and Pilgrim in showing the

photograph in the workplace.

### b. Not Based on Sex

The defendant next argues that the alleged harassment was not based on sex.  (Doc. 25 at

22).  In support of this assertion, it cites to *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134

(7th Cir. 1997).  In that case, the evidence was as follows:

> Gleason claims that Novak: (1) flirted with her cousin (not a Mesirow employee)
> when she visited the office, (2) flirted with her sister over the telephone, (3) told
> co-workers that some female customers were "bitchy," "dumb," or suffering from
> "PMS," (4) spoke to another female employee about the size of her breasts, [  ]
> (5) told another female employee that he liked her in tighter skirts, and (6) stood
> up at his desk to "ogle" women as they walked by.  According to Gleason, Novak
> once placed an advertisement for a nudist colony on her desk and informed her

---

[25] One obvious distinction is that the finding was after a trial.

that he had spent the weekend there (he had). On another occasion, Novak allegedly told Gleason, tearfully, that he had dreamt about holding hands with her.

*Gleason*, 118 F.3d at 1137.[26] Rejecting the plaintiff's claim, the court stated:

> . . . . This conduct, though it was directed at other women, allegedly took place in Gleason's presence at the desk. This kind of off-color, juvenile and inappropriate behavior no doubt contributed to the desk's perception of Novak as a "jerk." But the question is whether Gleason, particularly when this alleged behavior was directed at others and not herself, could "rationally consider herself at a disadvantage in relation to her male co-workers by virtue of being a woman." *Galloway*, 78 F.3d at 1168. We do not believe that a reasonable person in the plaintiff's circumstances would conclude that she was at a disadvantage vis a vis her male coworkers because of her sex, particularly as the record reveals that both male *and* female employees at the desk objected to Novak's overbearing and abusive manner and his "talking down" to desk employees. In other words, there may very well have been a *hostile* work environment for both sexes in Novak's department. However, that environment was not more hostile for women than for men. As this court has remarked, "Title VII is not directed against unpleasantness *per se* but only . . . against discrimination in the conditions of employment." *Carr,* 32 F.3d at 1009.

*Gleason*, 118 F.3d at 1145 (emphasis in original). The court also found it significant that the

alleged harrasser

> never touched the plaintiff. He did not invite her, explicitly or by implication, to have sex with him. He made no threats. He did not expose himself, or show her dirty pictures. He never said anything to her that could not be repeated on prime-time television.

*Gleason*, 118 F.3d at 1145 (*citing Baskerville* [*v. Culligan Intern. Co.*], 50 F.3d [428] at 431 [(7th

---

[26] The plaintiff in *Gleason* also complained that the individual also made the following comments about her pregnancy:

> . . . . According to Gleason, Novak (1) repeatedly suggested that she ought to get a special shield for her computer screen to protect the baby from radiation emitted by the screen, (2) stated that he hoped the baby's father would support the child (Gleason was a single mother), (3) shouted out "God bless you, God bless you" upon hearing about her pregnancy, (4) asked about dietary and/or alcohol restrictions on account of the pregnancy, and (5) said that he would be willing to give her advice on "single parenting," based upon his own experience as a single father. Gleason claims that Novak persisted in commenting on her pregnancy even after she requested that he stop.

*Gleason,* 118 F.3d at 1137. The court found that these statements were not discriminatory. *Id.* at 1140, 1145.

Cir. 1995)].

This court finds *Gleason* distinguishable.  In the present case, the conduct did involve inappropriate pictures and discussion that could not be repeated on prime-time television. Additionally, certain of the conduct, particularly the photographs, was directed at her, as well as others.  The court does note, however, a number of matters do not amount to sexual harassment. First, the fact that Castleberry learned at some point that others, including Scott, referred to her as a "lesbian" or a "dyke" is not necessarily sufficient to state a claim.  Second, the court finds that the incident involving Hollingworth is not evidence of sexual harassment.  Third, Scott's activities on the computer of entering "chat rooms" to talk with women about sexual topics does not affect Castleberry under the circumstances.  Fourth, the court does not find Scott's comments about wearing "Pampers or Depends" to be sexual.  Fifth, Scott's comments about the shower are not such that would disadvantage Castleberry as opposed to her male counterparts, simply because of being a woman.  Many of Scott's actions were rude, juvenile, and wholly inappropriate; but, they were not premised on gender so as to support a hostile environment claim.

### c.  Not Severe and Pervasive

The defendant next argues that the alleged harassment is not severe and pervasive enough to alter the terms and conditions of plaintiff's employment.  (Doc. 25 at 23).  As already noted, the court will examine the conduct in context and determine if under the *totality of the circumstances* it is sufficiently severe or pervasive to alter the terms or conditions of Castleberry's employment and create a hostile or abusive working environment.  *Mendoza*, 195 F.3d at 1246 (italics added).

44

Although, as already noted, the complained-of conduct is troubling, the court is not convinced that it meets the applicable-objective standard.  During the three month period that Castleberry worked at Schein Chevrolet, the evidence shows the following troubling conduct: Scott downloaded a photograph of "a naked woman masturbating on a float in a pool" (Castleberry Aff. at ¶ 9(d)); Pilgrim changed the photograph to depict Schein employees, including Castleberry, and showed it to Castleberry and others at the dealership (id. at ¶ 9(e)); Castleberry overheard Scott and other male employees talking about relations that Scott recently had with a female customer; Scott referred to Crane as a "'whore' and talked about her butt," and made a derogatory reference to Castleberry's breasts.

Castleberry does detail the frequency of some of the complained-about conduct.  She states that Scott was constantly on the computer communicating with women, but he only downloaded one picture (Castleberry Aff. at ¶¶ 9(c) & (d)); Pilgrim apparently showed the altered picture to her only once (id. at ¶ 9(e)); the discussion regarding the customer occurred once (id. at ¶ 9(f)); and, Scott made an inappropriate reference to her breasts one time (id. at ¶ 9(j)).  There is no evidence that Scott or any other employee touched Castleberry or asked her, explicitly or implicitly, to have sex.  There were no threats or inappropriate gestures.

Under the circumstances, the court cannot find the evidence sufficient to demonstrate that the conduct interfered with the performance of her job.  To the contrary, the evidence shows that Castleberry responded to the "lesbian" comments by joking with another employee.  (Castleberry Aff. at ¶ 9(a)).  She also joked with Scott when he commented about a woman's breasts using a slang term by stating "that he should not call them that, but should call them puppies" since she referred to them as that.  (Id. at ¶ 9(j)).  Summary judgment is due to be granted the defendant on

45

this claim.

### d. Employer Liability

Lastly, the defendant next argues that it is not liable for the alleged sexual harassment because it exercised reasonable care to prevent and correct any harassing behavior and because the plaintiff failed to take advantage of the preventative measures that were available. (Doc. 25 at 24). To support this argument, the defendant again notes that it had a policy in place that prohibited sexual harassment and Castleberry received a copy of the same. (Schein Depo. at Ex. 1). The defendant also states that Castleberry failed to complain to Schein and only told Wells of Scott's comments at the smoking pole. (Doc. 25 at 25). The defendant places too restrictive a reading on Castleberry's testimony. She stated that she talked to Wells two or three times with Wells merely responding that "that's just the way he [(Scott)] is." (Castleberry Depo. at 101). She also stated in her affidavit that she complained to Wells about Scott's disgusting comments and behavior. (Castleberry Aff. at ¶ 12). Given Castleberry's alleged complaints to Wells and the deferential character of a summary judgment analysis, the motion would be due to be denied except for the fact that the court previously found that the conduct is not sufficiently severe and pervasive as to Castleberry to state a claim.[27]

### C. Gail Castleberry – Demotion Claim

The defendant also alleges that summary judgment is due to be granted on Castleberry's demotion and termination claim. (Doc. 25). With regard to this claim, the defendant states that Schein gave Castleberry a chance in the management position but she was unable to meet

---

[27] Castleberry also states that Wells told her not to go to Schein with her problems. She stated that "Wells told us that it would be our heads." (Castleberry Aff. at ¶ 14).

46

"Schein's performance expectations." (Doc. 25 at 12). Also, it asserts that Castleberry was offered an opportunity to stay in the employ of the defendant following her demotion, but she voluntarily chose not to do so. (*Id.*). Given the foregoing, the defendant states that Castleberry's demotion and termination claim is without merit. (Doc. 25 at 12).

A prima facie case of discriminatory discharge is established when the plaintiff proves: (1) that she is a member of a protected class, (2) that she was qualified for the position held, (3) that she was discharged (or demoted), and (4) that she was replaced by a person outside the protected class, or that she was discharged while a person outside the protected class was retained. *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1290 (11th Cir. 1998). Castleberry meets this test. She is a member of a protected class (female), she was qualified for the job held because she had previous experience, she was discharged and/or demoted, and she was replaced by a person not within the class of protected persons (a male).

The defendant contends that the plaintiff was not qualified to do the job because of her unsatisfactory performance. (Doc. 25 at 14-15). The Eleventh Circuit has stated:

> Our case law quite clearly instructs that plaintiffs, who have been discharged from a previously held position, do not need to satisfy the *McDonnell Douglas* prong requiring proof of qualification. We have explained that the reason for this modification of *McDonnell Douglas* is that in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred.

*Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1360 (11th Cir. 1999) (internal quotations and citations omitted), *cert. denied*, 529 U.S. 1109, 120 S. Ct. 1962, 146 L. Ed. 2d 793 (2000); *see also Pace v. Southern Railway System*, 701 F.2d 1383, 1386 n.7 (11th Cir.), *cert. denied*, 464 U.S. 1018, 104 S. Ct. 549, 78 L. Ed. 2d 724 (1983) ("[I]n discharge and demotion cases, where a

plaintiff has held a position for a significant period of time, qualification for *that* position,

sufficient to satisfy the test of a *prima facie* case can be inferred. However, where the position

sought has not been held previously [such as in failure to promote and failure to hire cases] there

is no basis for an inference of qualifications.") (emphasis added).

The present case is different than the situation in *Damon*, Castleberry held the position in

question a short time – approximately three months. However, she had previous management

experience as was noted by Schein. (Schein Depo. at 75-76, 85-86). Although *Damon's* strong

admonition would not apply in this case because of the short time the position was held by

Castleberry, the court finds that the argument concerning qualifications is more appropriate for

consideration under the section dealing with whether the defendant's articulate reason, poor

performance, is the true reason for the demotion. Accordingly, the court concludes that

Castleberry has stated a prima facie case.

Because Castleberry has satisfied her initial burden, as just noted, the burden shifts to the

defendant to articulate evidence "which would allow the trier of fact to conclude that the

employment decision had not been motivated by discriminatory animus." *Texas Dept. of*

*Community Affairs v. Burdine*, 450 U.S. 248, 257, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1980). The

defendant asserts that Castleberry was dismissed from her managerial position due to

performance problems that caused a dip in "the numbers." (Schein Depo. at 95). Specifically,

Wells stated that Castleberry "had a hard - - the gross profit[28] was off, some of the sales people

had problems desking deals with her, her inventory was getting out of wack. In other words, it

---

[28] "Gross profit" is the amount a vehicle sells for less the amount paid, before expenses, including sales commission, advertising, legal and auditing fees, and reconditioning costs. (Wells Depo. at 28-30).

was - - she'd bring cars in too high or too low.[29]  Just her general knowledge of the used car business wasn't what I had hoped it would be or expected it to be." (Wells Depo. at 27).  Schein explained the problem as follows:  Castleberry "was only there two months, one was good, one was bad." (Schein Depo. at 95).  She also said that Castleberry did not pay attention to the details.  (*Id.* at 92).  By way of example, Schein stated that Castleberry would send cars for service or body repairs and forget where they were.  (*Id.*).  Regarding this last event, Schein stated that it was "probably factored" into the decision to terminate Castleberry.  (*Id.*).  Lastly, Schein and Wells stated that they had a customer complaint "about her foul language, her unprofessional behavior," however, that was not a basis of Castleberry's termination.  (*Id.* at 92-93; Wells Depo. at 40).  Schein and Wells concluded that Castleberry could not do the job.  (Schein Depo. at 95-96; Wells Depo. at 41).  Wells told her that "they still valued her as an employee." (*Id.* at 47).  She was given the opportunity to do sales work at either dealership.  (Schein Depo. at 96-98; Wells Depo. at 43, 47-48).  Wells talked with her about going to the Chrysler dealership since it was smaller and might afford her an opportunity for a management position at a later date.  (Wells Depo. at 43, 46-47).

Having proffered admissible evidence that the decision to demote Castleberry was nondiscriminatory, the burden shifts back to Castleberry to show that the reason articulated was a mere pretext for discrimination.  *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Castleberry may satisfy this burden with circumstantial evidence by presenting "sufficient evidence to allow a fact finder to disbelieve an employer's proffered explanation."  *Combs v. Plantation Patters*, 106 F.3d 1519, 1532 (11th Cir. 1997), *cert.*

---

[29] By being out of "wack," Wells meant that the inventory of older vehicles was too high.  (Wells Depo. at 30-32).

*denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

The plaintiff retorts the defendant's evidence of a legitimate reason for its decision to terminate Castleberry by showing that although Schein states that she was discharged due to "the numbers," the defendant's records for February and March show that the 50 cars per month goal was met. In comparison, the previous managers' numbers for the same months the preceding year were 40 and 36, respectively. (Doc. 30 at 34; Doc. 37 at Ex. 3). Additionally, in the last thirteen months prior to her being placed in the used car manager's position, she notes that the goal was met only twice (July and December 1998).[30] (*Id.*; Schein Depo. at 221). Still further, Castleberry notes that she met that goal twice in three months, for which she was congratulated by Wells.[31] (Schein Depo. at 220-21). Castleberry states as follows regarding Wells's comments:

> At the conclusion of February 1999, Wells congratulated me on my performance for the month. In or around April of 1999, after I became used car manager, I attended a sales meeting with salespeople and manager [sic] from both Susan Schein Chevrolet, Inc., and Susan Schein Chrysler, Inc. At the meeting, Wells announced that our used car department had just finished a record month (referring to March), and congratulated me publicly for the same. Wells said that the used car department had sold more cars than it had in a long time.

(Crane Aff. at ¶ 7). Finally, she states that on or about April 24, 1999, Wells told Castleberry that Fred Tetro, the Finance and Information manager, would be taking her place. (*Id.* at ¶ 13).

---

[30] The defendant notes that the plaintiff "completely ignores [the] fact that her successor, Fred Tetro, a male, was allowed only two months in the job, the same amount of time that plaintiff was allowed in the job, before he was asked to leave the position because of poor job performance." (Doc. 35 at 12-13). Although this is correct, there is no specific evidence concerning his performance other than Wells's comment that he did not feel like Tetro was doing a good job. (Wells Depo. at 40). Schein testified that he was "terminated" because she thought "he had one good month and one bad month." (Schein Depo. at 30). Placing all the evidence adduced on the motions in context, it presents the jury with evidence it finds sufficient to disbelieve the defendant's proffered reason. *Combs*, 106 F.3d at 1543.

[31] Castleberry was terminated in the third month. However, 48 vehicles were sold that month, which was 20% more than the preceding number for that month the year before.

When she asked why, Wells responded, "Well he just is. I'm putting a guy in your place." (*Id.*).

Under the circumstances, a reasonable fact finder could conclude that the defendant's proffered reason was not the real reason that actually motivated it. *Combs*, 106 F.3d at 1538. Although the defendant asserts that the decision to demote the plaintiff was premised on "the numbers," that reason is brought into question by the evidence adduced by Castleberry. To the extent that the defendant asserts that the plaintiff cannot rely upon the total number of cars sold each month (doc. 35 at 10), the court agrees in part. This is not determinative, but it is certainly a factor when placed in context of Wells's comment at the end of March.[32] To the extent that the defendant asserts that her demotion was premised on her "overall job performance, including her performance in the areas of profit, inventory, employee relations and customer relations" (*id.*), this is also inconsistent with Wells's statement at the March meeting. Accordingly, summary judgment is due to be denied as to this claim.[33]

---

[32] The defendant also discounts Wells's statement made at the end of February that she was performing well because she only began working as the manager on or about February 20, 1999. (Doc. 35 at 11). The importance of this statement on the present motion is that it was allegedly made by Wells after she was placed in the position, even though it was for a short term at that time, and it could be a basis, at least in part, for the jury to question the defendant's proffered reason for demoting the plaintiff.

[33] To the extent that the defendant asserts that the plaintiff's argument that her demotion was premised on discrimination is undermined by the fact that the same individuals who promoted her also made the decision to demote her, the court is not impressed. (Doc. 25 at 19). The court declines to make such an inference in favor of the defendant on its motion for summary judgment. In *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1441 (11th Cir. 1998), when the same individual was responsible for hiring, promoting, and ultimately terminating the plaintiff, the court stated that such "facts may give rise to a permissible inference that no discriminatory animus motivated defendant's actions." The *Williams* court stated:

> . . . . Based on our consistent precedent, as articulated in *Combs*, we conclude that "same actor" evidence of the sort introduced in this instance constitutes evidence that a jury may consider in deciding the ultimate issue of intentional discrimination. Evidence that the same actor both hired and fired the plaintiff, in some circumstances, may help to convince a jury that the defendant's proffered legitimate reasons for its decision are worthy of belief; it is the province of the jury rather than the court, however, to determine whether the inference generated by "same actor" evidence is strong enough to outweigh a plaintiff's evidence of pretext.

*Id.* at 1443. The court further stated in a footnote:

> It is worth restating that, in this circuit, "evidence of pretext, when added to a prima facie case, is sufficient to create a genuine issue of material fact that precludes summary judgment." *Combs*, 106 F.3d at 1531. It therefore would be inconsistent with our precedent to require a plaintiff in "same actor" cases not

**D. Constructive Discharge**

Both plaintiffs advance constructive discharge claims.   The Eleventh Circuit has stated:

"[W]hen an employee involuntarily resigns in order to escape intolerable and illegal employment requirements to which he or she is subjected because of race, color, religion, sex, or national origin, the employer has committed a constructive discharge in violation of Title VII." *Henson v. City of Dundee,* 682 F.2d 897, 907 (11th Cir. 1982) (*quoting Young v. Southwestern Savings & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir. 1975) (internal quotation marks omitted)).  Moreover, a plaintiff "must demonstrate that [her] working conditions were so intolerable that a reasonable person in [her] position would be compelled to resign." *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1317 (11th Cir. 1989) (citations omitted); *see also Hill v. Winn-Dixie Stores, Inc.,* 934 F.2d 1518, 1527 (11th Cir. 1991); *Wardwell v. School Bd. of Palm Beach County,* 786 F.2d 1554, 1557 (11th Cir. 1986).

*Morgan v. Ford,* 6 F.3d 750, 755-56 (11th Cir. 1993), *cert. denied,* 512 U.S. 1221, 114 S. Ct. 2708, 129 L. Ed. 2d 836 (1994); *accord Doe v. Dekalb County School Dist.,* 145 F.3d 1441, 1450 (11th Cir. 1998).  In order to state a claim, there must be "a high degree of deterioration in working conditions, approaching the level of intolerable." *Hill v. Winn-Dixie,* 934 F.2d 1518, 1527 (11th Cir. 1991) (internal citation and quotes omitted).  Additionally, "constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation." *Kilgore v. Thompson & Brock Management, Inc.,* 93 F.3d 752, 754 (11th Cir. 1996).

**1. Robin Crane**

Although Crane has satisfied the court that the motion for summary judgment is due to

---

only to show pretext but, in addition, to present further evidence to overcome a special inference created by the "same actor" evidence. Such a rule would be contrary to our previous determinations that a plaintiff need not prove discriminatory intent at the summary judgment stage but, rather, must present evidence from which a jury reasonably could infer that the defendant's non-discriminatory justification for its employment decision is pretextual.

*Id.* at 1443 n.14.

To the extent the defendant argues that the position was an interim one, the disputed issue remains as to the basis for the demotion.

be denied on the hostile environment claim, the court believes that the motion is due to be granted as to the constructive discharge claim. The court is not satisfied under the circumstances that the evidence is sufficient to support a jury determination that the working conditions were so intolerable that a reasonable person in her situation would be compelled to resign.

### 2. Gail Castleberry

As already noted, Castleberry has not satisfied the court that the motion for summary judgment is due to be denied on the hostile environment claim. Similarly, the court finds that the defendant's motion for summary judgment is due to be granted on the constructive discharge claim. The evidence is not sufficient to support a jury determination that the working conditions in her situation were so intolerable that a reasonable person in Castleberry's circumstance would be compelled to resign.

## IV. CONCLUSION

The motions to strike are to be denied in part and granted in part as stated herein. Crane has met her burden in opposition to motion for summary judgment on her claim of sexual harassment. Castleberry has met her burden in the context of her demotion claim. In all other respects, the motions for summary judgment are due to be granted. An appropriate order will be entered.

DONE, this the ___day of September, 2002.

JOHN E. OTT
United States Magistrate Judge